**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PENN WAREHOUSING & | : | |
| DISTRIBUTION, INC., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 22-2285 |
| v. | : | |
| | : | |
| SS UNITED STATES | : | |
| CONSERVANCY, | : | |
| Defendant. | : | |

**June 14, 2024**                                              **Anita B. Brody, J.**

## <u>MEMORANDUM OPINION</u>

On March 28, 2022, Penn Warehousing & Distribution Inc. ("PWD") sued the SS United States Conservancy (the "Conservancy") seeking ejectment of the Conservancy's vessel from its berth at a pier PWD operates on the Philadelphia side of the Delaware River.  PWD also seeks money damages for alleged unpaid dockage fees.  ECF No. 1-5.  The Conservancy removed the action from the Philadelphia Court of Common Pleas and asserted a counterclaim for breach of the implied covenant of good faith and fair dealing.  ECF Nos. 1, 16.

I have jurisdiction under 28 U.S.C. § 1332.[1]  I held a bench trial on January 17 and 18, 2024.  ECF Nos. 47-48.  The parties submitted proposed findings of fact and conclusions of law. ECF Nos. 50-51.

---

[1] PWD is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  It is a citizen of Delaware and Pennsylvania.  The Conservancy is a non-profit organization incorporated in Washington, DC and is a citizen of the District of Columbia.  ECF Nos. 7, 16.  PWD claims that more than $75,000 in unpaid fees are in dispute.

I.    **FACTUAL BACKGROUND**

    A.    **The parties**

PWD provides warehousing and trans-shipping services for maritime cargoes at several piers it leases from the Philadelphia Regional Port Authority ("PhilaPort").  Its agreement with PhilaPort includes Pier 82, an older, general cargo pier that has been inactive and used as a "lay up pier" for decades.  Trial Tr. (ECF No. 47), Test. of John Brown ["Brown Test."], 29-30, 82-83; Trial Tr. (ECF No. 47), Test. of John T. Reynolds ["Reynolds Test."], 179.  The *SS United States* (the "Ship") has been berthed along the north side of Pier 82 since the 1990s.

The Ship operated as a luxury ocean liner in the 1950s and 1960s and was celebrated for its speedy transatlantic crossings, fueled by its military-grade design and construction through a public-private partnership.  After it was decommissioned in 1969, various entities – including Norwegian Cruise Lines ("Norwegian"), that owned it from 2003 to 2011 – endeavored to redevelop the Ship as a cruise ship or floating condominiums. When Norwegian abandoned its effort, it listed the 990-foot long, inoperable vessel for sale as scrap.  Trial Tr. (ECF No. 47), Test. of Susan Gibbs ["Gibbs Test."], 108, 111-12.

The Conservancy is an independent nonprofit organization dedicated to raising public awareness of the Ship's historical significance and preserving its fixtures.  Gibbs Test., 109-11. It purchased the Ship from Norwegian in 2011 and embarked upon a search for partnership and redevelopment opportunities to repurpose the vessel.  Gibbs Test., 117.

    B.    **The Berthing Agreement and the parties' contemporaneous expectations**

Until it effectuated such a development plan, the Conservancy maintained the Ship at its location in Philadelphia.  It retained the logistics and property manager that Norwegian had used for the Ship to continue to safeguard the lines attaching the vessel to bollards on Pier 82.  Gibbs

Test., 110-21.  It also entered into an agreement with PWD, reflected in a writing dated June 15, 2011 and drafted by PWD's Controller, Hubert Manns.  The two-page document, entitled "Continuation of Berthing Services for S.S. United States" (the "Berthing Agreement"), opens with two paragraphs of narrative text:

> This document shall serve as the written contract for berthing services between SS United States Conservancy ("SSUSC") and Penn Warehousing & Distribution, Inc. ("PWD"), SSUS [*sic*] wishes to continue the current berthing services that are in place for the S.S. United States (the "Vessel") on the north side of Pier 82 ("Pier 82") and Penn wished to continue to provide such services.
>
> Penn shall invoice SSUSC at the above address at the beginning of each month for a lay up dockage fee of $850.00 for each twenty-four (24) hour period or fraction thereof that the Vessel occupies its current berth, beginning February 1, 2011, and continuing until upon removal of the vessel from its current location.

Ex. P-6.  It then describes the "terms and conditions [that] apply," including:

> (1) The lay up dockage fee is for the parking of the Vessel at Pier 82 only.
>
> (2) The securing of the Vessel to Pier 82 is the sole and exclusive responsibility of the SSUSC.
>
> (3) The SSUSC shall have the sole and exclusive responsibility for maintaining (and if necessary repairing and/or replacing) the bollards and protective bumpers on the north side of Pier 82 in a condition acceptable to the Port Authority of Philadelphia.  An inspection of these bollards and protective bumpers will be mandatory upon removal of the vessel from this dockage location.
>
> …
>
> (6) The cost of moving the Vessel is the sole and exclusive responsibility of SSUSC.  SSUSC agrees that prior to removal of the Vessel: (i) it will repair the bollards at Pier 82 as required by paragraph 3 above, and pay all dockage fees, or (ii) post a bond in an amount deemed necessary (as determined in good faith solely by Penn) to repair Pier 82, as required by paragraph 3 above, and/or pay all dockage fees.

3

*Id.*

There are certain notable omissions from the Berthing Agreement.  It contains no provision for any change in the "lay up dockage fee" over time or under any circumstances.  And it contains no provision as to how either party could terminate the contractual relationship save for its termination "upon the removal of" the Ship from the berth.

At the time of contracting, neither PWD nor the Conservancy knew how long the Ship would remain at Pier 82.  Brown Test., 41-42; Gibbs Test., 137-38.  The Conservancy did not view Pier 82 as the location at which the Ship would remain in perpetuity nor even the location from which it would be re-developed.  Gibbs Test., 121.[2]

### C.     Smooth sailing: The parties' conduct under the Berthing Agreement (2011-2020)

After it acquired the Ship in 2011, the Conservancy worked with potential developers to plan either to refurbish the Ship or to develop it as a permanently-moored fixture at some other location where it could serve as a hotel, condominiums, or a multi-purpose venue.  It covered its monthly carrying costs of $50,000-$60,000 through a combination of donations and income from exclusive option agreements with potential developers.  Gibbs. Test. 111-19, 157-58.  Neither PWD nor the Conservancy sought to make any changes to the Berthing Agreement from 2011 to 2020.

### D.     PhilaPort and PWD rock the boat (2020-2022)

In August 2020, PhilaPort expressed its concern to PWD that the Ship was causing

---

[2]  The Conservancy developed two contingency plans if it were unable to achieve its objective to restore or refurbish the Ship: (1) to have the Ship sunk as an artificial reef in a location that would be determined; or (2) to sell the Ship for scrap, as Norwegian had planned to do prior to the Conservancy's acquisition of the Ship in 2011.  Gibbs Test., 161-63.

damage to Pier 82.  It demanded that PWD promptly implement changes to the Ship's mooring

at the Pier and that it move the Ship by October 31, 2020.  Ex. D-12; Brown Test., 46-47.  PWD

relayed these concerns to the Conservancy but did not ask it to remove the Ship.  Ex. D-13.

Within the next year, however, PWD came to view the Ship's continued presence at Pier

82 to be detrimental to its interests.  It decided "to force the issue to get the ship off the dock" by

raising the docking fee.  Brown Test., 66.  Citing the "many years" the Ship had been docked at

the pier without a rate increase or adjustment of "the dockage rent," PWD notified the

Conservancy by letter dated August 10, 2021 that it was increasing the daily berthing charge to

$1,700 effective August 24, 2021.  Ex. P-7.  When the Conservancy did not increase its

payments,[3] PWD declared that the Conservancy was in default under the Berthing Agreement.

Ex. P-15 (letter dated October 5, 2021).  The Conservancy responded by sharing an update on an

anticipated transaction that would result in the Ship's removal from Pier 82 some six months

later.  *See* Ex. P-16 (referencing prior communications).  PWD, however, persisted in the view

that the Conservancy was in breach of the Berthing Agreement for paying only the original

dockage fee.  Ex. P-16 (letter dated January 25, 2022).

Finally, in a letter dated March 11, 2022, PWD notified the Conservancy that "the

tenancy of [the Conservancy] at the Port of Philadelphia, Pier 82 is terminated as of March 26,

2022."  It sought payment for the alleged unpaid dockage fees and demanded the Conservancy

"move the Vessel by March 26, 2022."  Ex. D-11.  The Conservancy did not do so, and on

March 28, 2022, PWD filed its lawsuit against the Conservancy for money damages and

---

[3]  Apart from the first one or two months following the demand letter, during
which the Conservancy paid the daily rate of $1,700, the Conservancy re-adjusted
its payments back to the original rate and thereafter continued to make payment at
the daily rate of $850.  Brown Test., 67-68.

ejectment.  ECF No. 1-5.

As of the time of trial, the Ship remained docked at Pier 82 and the Conservancy continued to pay for berthing at a rate of $850 per day.  Brown Test., 73; Gibbs Test., 132-33.[4] The Conservancy has paid over $4 million to PWD pursuant to the Berthing Agreement since 2011.  Gibbs Test., 133.

## II.   DISCUSSION

PWD filed its complaint as a dispute involving real property, *see* ECF No. 1-5 at p. 7 (cover page to Comm. Pl. Ct.), and justified its claim for money damages and ejectment under principles of Pennsylvania's Landlord Tenant Act.  *See* ECF No. 1-5 at Ex. 3 (letter exhibit to complaint describing action as eviction and citing 68 P.S. § 250.501(b)).  In its post-trial submission, PWD characterized the Berthing Agreement as a month-to-month lease.  *See, e.g.,* ECF No. 50 at 11-13.  The Conservancy likewise addressed the issues from the framework of a sublease to the master agreement between PhilaPort and PWD for control over the piers.  ECF No. 51 at 7.

But as a leading treatise notes: "Courts have not imposed the relationship of landlord and tenant upon parties without an agreement between them, either express or implied."  Ronald M. Friedman & Kelly A. Mroz, Pennsylvania Landlord Tenant Law and Practice 17 (5th ed. 2022).  Rather:

> The status of landlord or tenant depends in each case upon the existence of a lease between the parties.  Without a lease, neither party's status as landlord or tenant can be created and no legal rights can accrue under landlord-tenant law.

---

[4]  The development opportunity the Conservancy was pursuing as referenced in its 2021 correspondence with PWD did not result in a deal.  The exclusive development option, through which the potential developer funded the Ship's carrying costs, lapsed in June 2023.  Gibbs Test., 119-23, 157-58.

*Id.* at 10.  While the Landlord Tenant Act does not define the term "lease" (nor landlord or tenant), its provisions concerning leases make clear that they relate to "real property."  *See* 68 P.S. §§ 250.201 – 250.202.  And the Landlord Tenant Act *does* define "real property":  "'Real property' means messuages, lands, tenements, real estate, buildings, parts thereof or any estate or interest therein and shall include any personalty on real property which is demised with the real property."  68 P.S. § 250.102.

This action is not a suit about real property or possession of land.  The parties did not employ terms such as "lease" and "rent" in their written agreement but rather explicitly characterized the subject of the agreement as a "service" provided by PWD.  *See, e.g.,* Ex. P-6 ("This document shall serve as the written contract for berthing services between" PWD and the Conservancy); *id.* (noting the Conservancy "wishes to continue the current berthing services that are in place" and that PWD "wished to continue to provide such services").  Reference to the Landlord Tenant Act for the docking of the Ship at Pier 82 is thus inapplicable.  I will follow general contract law.

**A.     The Berthing Agreement is a contract for services at a fixed rate and of indefinite duration.**

The "fundamental rule" of contract interpretation is to ascertain the intent of the contracting parties.  *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 342 (Pa. 2011).  Here that intent is manifested in the written document from 2011, which concerned the provision of berthing services for the Ship.   Both parties agree that Pennsylvania law is applicable.

**1.     Rate**

The Berthing Agreement provides that PWD is entitled to payment of $850 for each day that the Ship remains berthed at Pier 82.  It contains no provision for any escalation in this charge.

PWD's unilateral demand for increased dockage fees beginning in August 2021, with 14 days' notice, finds no support in the Berthing Agreement or contract law.[5]  The Conservancy never agreed to pay more than the rate specified in the 2011 written agreement.  There is no basis to order the Conservancy to pay more than it bargained for.  The Conservancy's failure to pay at the daily rate of $1,700 does not amount to a breach of the Berthing Agreement or entitle PWD to any damages.

### 2.    Duration

PWD drafted the Berthing Agreement to offer to the Conservancy a place to keep the Ship "parked" while it sought a permanent home.  Having already provided berthing services to the prior owner, PWD understood that the Ship was an inoperable, mammoth vessel that could not be removed without preparations requiring at least a few months of planning for appropriate insurance, a towing partner, and Coast Guard approval for travel according to the tide schedule. Gibbs Test., 172.   PWD also understood that the Conservancy acquired the Ship for the purpose of finding a partner to refurbish or repurpose it; its mission involved developing a plan to remove the Ship from the berth where its previous owners had left it.   Yet the terms of the Berthing Agreement spared the Conservancy of having to make arrangements for the disposition of the Ship along any particular timetable: it set the inception of the contract term as February 1, 2011 but did not provide a date for its conclusion.[6]  The duration is defined only in relation to the

---

[5]  PWD's demand may have been based on the faulty assumption that the Berthing Agreement operated as a month-to-month lease and that the terms were subject to revision at the end of any 30-day period.

[6] These circumstances undermine the notion advanced by PWD at trial that I should imply that the term of the Berthing Agreement was 30 days and that the agreement simply renewed month after month.  (N.T. Tr., Day One, at 7 (opening statement).)  Rather, the circumstances support the notion that PWD was willing to tolerate the Ship's continued berth at Pier 82, upon continued payment of

"removal of the vessel from its current location," with no specificity as to how that removal might be accomplished or who could effectuate such a removal.

Courts disfavor contracts of perpetual duration absent clear and unequivocal terms showing that intent. *See D&M Sales, Inc. v. Lorillard Tobacco Co.*, No. 09-2644, 2010 WL 786550, *3 (E.D. Pa. Mar. 8, 2010) (reviewing Pennsylvania law). It is "unreasonable for parties to intend for contracts to last forever absent unequivocal terms." *Roberts Tech. Grp., Inc. v. Curwood, Inc.*, 2015 WL 5584498, *5 (E.D. Pa. Sept. 23, 2015). The Fifth Circuit offers insight into this area in *Delta Services & Equipment, Inc. v. Ryko Manufacturing Co.*, 908 F.2d 7 (5th Cir. 1990), a case in which it interpreted a distributorship agreement that did not specify the duration of the agreement. There the manufacturer gave notice of termination, and the distributor sought a court order prohibiting termination. The court described various "policy reasons for the presumption against perpetual contracts," including "the presumption that [one party] could not have intended to surrender control of their own business and services for life[.]" *Delta Svcs.*, 908 F.2d at 10, 11. Looking to the UCC provision that was implicated by the agreement, the court explained:

> Although authorities on § 2–309 are sparse as to when a contract is
> considered indefinite, strong policy reasons support the
> presumption in favor of interpreting the contract as one of
> indefinite term. First, common sense tells us that parties ordinarily
> do not intend to maintain their business relationships forever.
> Second, one of the important goals of the UCC—to promote
> mutually beneficial business dealings—is not fostered if the parties
> are required to remain in the business relationship after it has
> soured.

*Delta Scvs.*, 908 F.2d at 11. *See also id.* (noting "the salutary effect of permitting parties to end a soured relationship without consequent litigation") (citation omitted).

---

significant fees, for a substantial period of time.

The effect of the determination that a contract was for an "indefinite term" is that, in the absence of contrary evidence,[7] the contract will be presumed to be terminable at will with reasonable notice.  This principle is reflected in many contexts.  Pennsylvania state courts have recognized the "general rule" that "when a contract provides that one party shall render service to another … but does not specify a definite time or prescribe conditions which determine the duration of the relation, the contract may be terminated by either party at will."  *Slonaker v. P.G. Publ'g Co.,* 13 A.2d 48, 49 (Pa. 1940).  *See also Wyeth Pharm., Inc. v. Borough of West Chester*, 126 A.3d 1055, 1064 (Pa. Commw. Ct. 2015) (recognizing, "[i]n general," a contract for an indefinite period "will be construed to be for a reasonable time or terminable at will" unless a different intention of the parties can be determined).  In Pennsylvania's statutes, where an agreement that is subject to the Uniform Commercial Code provides for successive performances but is indefinite in duration, it is considered "valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." 13 Pa. Cons. Stat. § 2309(b).  *See also D&M Sales, Inc. v. Lorillard Tobacco Co.*, No. 09-2644, 2010 WL 786550, *3 (E.D. Pa. Mar. 8, 2010) (citing this provision to interpret a distribution agreement).  And a federal district court has noted that while it "is axiomatic businesses entering into a mutually beneficial relationship wish for it to be long-term," courts will presume contracts of indefinite duration are terminable at will in the absence of sufficient contrary evidence.  *Roberts Tech. Grp., Inc. v. Curwood, Inc.*, 2015 WL 5584498, *7 (E.D. Pa. Sept. 23, 2015).  This practice "makes good business sense."  *Id.* at *5.

---

[7]  To overcome the presumption that an agreement is terminable at will, a party must offer evidence of "the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement."  *Slonaker v. P.G. Publ'g Co.,* 13 A.2d 48, 50-51 (Pa. 1940).

The trial record confirms that the parties did not expect the Ship to remain at Pier 82 –
and thus require berthing services from PWD – forever.  Representatives from both PWD and the
Conservancy admitted that, at the time of contracting, they did not know how long the Ship
would remain at Pier 82.  Brown Test., 41-42; Gibbs Test., 137-38.  It was not the Conservancy's
goal, however, to maintain the Ship at Pier 82 forever.  Rather, its purpose in acquiring the Ship
was to secure a future for it at another location or restore it as a sea-worthy vessel.  Gibbs Test.,
121.  The Conservancy had the opportunity at trial to point to any evidence of the surrounding
circumstances, the situation of the parties, their objectives, and the nature of the subject matter of
the Agreement that would show that the parties intended for the Ship to remain at Pier 82
indefinitely.  It did not carry that burden.   The Berthing Agreement does not require PWD to
provide berthing services in perpetuity but rather that the contractual relationship is of indefinite
duration and may be terminated at will with reasonable notice.

**B.    PWD may terminate the Berthing Agreement with reasonable notice.**

As the Fifth Circuit observed in *Delta Services*, "the reasonable notice requirement has
considerable flexibility which helps to avoid inequitable results."  *Delta Svcs.*, 908 F.2d at 12.
The court noted that the UCC provision applicable in that case reflected the notion that a
requirement for reasonable notice of termination "recognizes that the application of principles of
good faith and sound commercial practice normally call for such notification of the termination
of a going contract relationship as will give the other party reasonable time to seek a substitute
arrangement."  *Id.* (quoting UCC historical note).  These same principles inform my analysis.

The Berthing Agreement here placed no restrictions upon either party's ability to
terminate the contract and did not address termination apart from the circumstance of the Ship's
"removal" from the berth.  The parties' relationship remained in place to their mutual satisfaction

for approximately 10 years.  That has been more than a reasonable time for a services agreement to continue until an amendment.

PWD sought to terminate the contractual relationship in its March 11, 2022 letter in which it announced the termination of "the tenancy."  It ostensibly believed this action was justified by the Conservancy's failure to pay the increased fees it demanded.  It reiterated its intent that the relationship end when it filed its lawsuit against the Conservancy on March 28, 2022, seeking a court order for ejectment of the Ship from Pier 82.  Since that time, and despite efforts to negotiate a satisfactory resolution, it has become clear that the relationship between the parties is broken.

I will recognize PWD's notice of intent to terminate given on March 11, 2022 but will not give effect to the termination on the date set by PWD,[8] as it did not incorporate reasonable notice.  Once the matter went into litigation, the Conservancy reasonably asserted that it was not required to "vacate," as demanded by PWD, as it was not in breach for failure to pay the increased fee that had been unilaterally set by PWD.  As a matter of equity, I will toll the effective date of the termination through this period of litigation.  The effective date of the termination, by which date the Conservancy must remove the Ship from Pier 82, will be 90 days from the date of this decision.  This termination date gives the Conservancy reasonable notice to finalize and effectuate a departure plan.

### C.    PWD is not entitled to monetary damages.

The Berthing Agreement obligated the Conservancy to pay $850 for every day that the

---

[8]  PWD appears to have identified March 26, 2022 as the earliest possible date that it could demand the Conservancy to "vacate the premises" under the Landlord Tenant Law for failure to pay rent under a lease.

Ship was berthed at Pier 82. It has done so. The Conservancy's refusal to pay the increased dockage fee demanded by PWD in August 2021 does not reflect a breach of its contractual obligations. PWD's claim for monetary damages for breach of contract is without merit.

**D.     PWD is not liable to the Conservancy for breach of the implied duty of good faith and fair dealing.**

The Conservancy's counter-claim asserts that PWD violated the implied duty of good faith and fair dealing. It notes that PWD doubled the daily charge at a time when repairs on Pier 82 prevented the Conservancy from hosting donor events on the Ship and when opportunities to remove the Ship were hampered by pandemic-related shipping issues. ECF No. 16, ¶ 53.

At trial, the Conservancy consented to PWD's motion for a non-suit insofar as it sought damages for lost donor tours. N.T. Tr. Day Two, ECF No. 48, at 13. It introduced no evidence of any other damages it suffered, nor did its post-trial proposed findings seek an award of damages in its favor.

## III.    CONCLUSION

The Berthing Agreement obligates the Conservancy to pay PWD $850 for each day that it is docked at Pier 82. Because the Berthing Agreement did not permit PWD to alter the fee that was agreed to by the parties, the Conservancy did not breach the Berthing Agreement by refusing to pay the $1,700 daily dockage fee demanded by PWD in August 2021.

Under Pennsylvania contract law, the Berthing Agreement is terminable at will by PWD upon reasonable notice to the Conservancy. The Conservancy has been on notice of PWD's wish to terminate the Berthing Agreement since March 2022, when PWD issued its "Notice of Termination" letter and then filed this lawsuit. I will deem the Berthing Agreement terminated as a matter of law effective September 12, 2024. The Conservancy must remove the Ship from Pier 82 within this approximately 90-day period.

Judgment will be entered in favor of PWD insofar as it sought the termination of the contractual relationship and a judicial determination that the Ship must depart Pier 82.

        ___ _s/ANITA B. BRODY, J.__ ____
        ANITA B. BRODY, J.